# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF WISCONSIN

HSBC MORTGAGE SERVICES, INC.,

                          Plaintiff,

v.                                                          Case No. 16-CV-80-JPS

NADIR N. DAYA and SHANTI DAYA,

                          Defendants.                       **ORDER**

## 1.    INTRODUCTION

This case arises from a settlement gone awry—again, and again, and again. Plaintiff HSBC Mortgage Services, Inc. ("HBSC") alleges that Defendants Nadir and Shanti Daya (the "Dayas") refused to honor a settlement agreement the parties reached in a state-court foreclosure action HSBC had brought against them. In that case, the parties reached a settlement in principle and notified the court. They continued to negotiate the specifics of the final written settlement agreement. Prior to the Dayas putting their signatures on the dotted line, the state court dismissed the foreclosure action on the representation that the matter had been settled. When HSBC later approached the Dayas to secure their signatures on the final written settlement agreement, they balked, saying that they had no reason to agree to anything since the state court had dismissed the case against them. When HSBC filed a motion to vacate the dismissal, the Dayas changed their minds and confirmed their interest in signing the settlement agreement. Revisions of the document continued for a time. After a couple of months, however, the Dayas reversed course yet again and refused to sign the settlement agreement. HSBC tried to reopen the state court action once

more, but the request was denied. It subsequently brought this action, seeking a declaratory judgment that a valid and enforceable settlement agreement exists between the parties or, in the alternative, that the Dayas should be estopped from rejecting the settlement agreement.

HSBC filed a motion for summary judgment on September 30, 2016. (Docket #19). The Dayas responded on November 7, 2016, after being granted an extension by the Court. (Docket #26). HSBC replied on November 21, 2016. (Docket #28). For the reasons set forth below, the Court will grant HSBC's motion, although it will not award all the relief HSBC seeks.

## 2. STANDARD OF REVIEW

Federal Rule of Civil Procedure 56 provides that the court "shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see Boss v. Castro*, 816 F.3d 910, 916 (7th Cir. 2016). A fact is "material" if it "might affect the outcome of the suit" under the applicable substantive law. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A dispute of fact is "genuine" if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.* The court construes all facts and reasonable inferences in the light most favorable to the non-movant. *Bridge v. New Holland Logansport, Inc.*, 815 F.3d 356, 360 (7th Cir. 2016). The court must not weigh the evidence presented or determine credibility of witnesses; the Seventh Circuit instructs that "we leave those tasks to factfinders." *Berry v. Chicago Transit Auth.*, 618 F.3d 688, 691 (7th Cir. 2010). The party opposing summary judgment "need not match the movant witness for witness, nor persuade the court that [his] case is convincing, [he] need only come forward with appropriate evidence

Case 2:16-cv-00080-JPS   Filed 12/07/16   Page 2 of 34   Document 30

demonstrating that there is a pending dispute of material fact." *Waldridge v. American Hoechst Corp.*, 24 F.3d 918, 921 (7th Cir. 1994).

### 3.     RELEVANT FACTS

The following facts are drawn from HSBC's statement of material facts, the Dayas' response thereto, and the materials in the record, all viewed in the light most favorable to the Dayas.[1]

In March 7, 2005, the Dayas entered into a mortgage loan now held by HSBC, which is evidenced by a note ("Note") and secured by a mortgage ("Mortgage") on a property in Brookfield, Wisconsin. (Docket #27 ¶ 1). In 2009, the Dayas filed for bankruptcy before the United States Bankruptcy Court for the Eastern District of Wisconsin, captioned *In re Nadir Daya and Shanti Daya*, Case No. 2009-32800 ("Bankruptcy Proceeding"). *Id.* ¶ 2. As part of their Bankruptcy Proceeding, the Dayas entered into a reaffirmation agreement ("Reaffirmation Agreement") with HSBC, in which they reaffirmed their obligations to HSBC under the Note. *Id.* ¶ 3.

After making a number of mortgage payments in accordance with the terms of the Note and Reaffirmation Agreement, Defendants defaulted on their financial obligations to HSBC. *Id.* ¶ 4. In an affidavit submitted with his response, Nadir Daya avers that he and his wife defaulted on their payments because HSBC improperly raised their payment amount, in violation of the Reaffirmation Agreement, and refused to lower it after the Dayas complained. After the Dayas defaulted, on June 21, 2012, HSBC initiated a foreclosure action in the Waukesha County Circuit Court, captioned *HSBC Mortgage Services Inc. v. Nadir N. Daya, et al.*, Case No. 12-cv-1950

---

[1] As HSBC observes in its reply, the Dayas' response to HSBC's statement of material facts is replete with argument about the legal significance of the facts. *See* (Docket #29). The Court ignored this surplusage.

("Foreclosure Case"). (Docket #27 ¶ 5). The Dayas, through counsel, filed an appearance in the foreclosure case, answered HSBC's complaint, and asserted various affirmative defenses and counterclaims, including a counterclaim for breach of the Reaffirmation Agreement arising from HSBC raising the Dayas' mortgage payment amount. *Id.* ¶ 6. HSBC later filed a motion to strike and dismiss the Dayas' affirmative defenses and counterclaims. *Id.*

The parties eventually reached an agreement to settle the foreclosure case (the "Settlement Agreement"). *Id.* ¶ 7. On March 1, 2013, counsel for the Dayas, Rollie Hanson ("Hanson"), sent the following email to HSBC's counsel, Sulejman Disdarevic ("Disdarevic"):

> My clients are agreeable to settling this case as outlined below per your latest counter offer. However, we need clarification. We have been assuming the foreclosure action will be dismissed with prejudice as the loan payments will be starting over and my clients will be waiving any further claims against HSBC.
>
> - Waive accrued and unpaid interest in the amount of $46,557.31;
> - Waive fees in the amount of $337.50;
> - Beginning Principal Balance of $393,601.78;
> - Reduce of interest rate from 5.25% to 3.25%;
> - Extend Term to 30 years;
> - Approximate new P&I payment $1,712.98;
> - Tradeline deletion; and
> - Payment of $10,000.00 in attorney fees.
> - The Reaffirmation Agreement will be void, my clients (or both parties) will be released of any liability under the agreement.
>
> Please confirm when you have time that we have an agreement and confirm the dismissal of the foreclosure.

(Docket #21-4 at 5–6). The email bore Hanson's typed signature. *Id.* On March

6, 2013, Disdarevic replied:

> As a follow-up to our discussion earlier this week, I just
> wanted to confirm the parties agreement in principle to settle
> the above matter. As discussed, the settlement is subject to
> execution of releases to be signed by Mr. and Ms. Daya and
> HSBC. The material terms are as follows:
>
> - reduction of the principal balance to $393,601.78;
> - reduction of the interest rate from 5.25% to 3.25%;
> - waiver of accrued and unpaid interest in the amount
>   of $46,557.31;
> - waiver of fees in the amount of $337.50;
> - extension of the term of the loan to 30 years;
> - deletion of the credit report "tradelines" related to the
>   loan;
> - HSBC's payment of the Dayas' attorneys' fees in the
>   amount of $10,000;
> - Voiding of the Reaffirmation Agreement;
> - Dismissal of defendants' claims and defenses with
>   prejudice; and
> - Dismissal of HSBC's claim without prejudice.
>
> As discussed, after I am back in the office I expect to have more
> information about how HSBC intends to memorialize the new
> terms of the mortgage loan. Will then provide you with a draft
> settlement agreement. Please let us know if you have any
> questions in the meantime.

*Id.* at 5.[2] Disdarevic typed his signature into the email. *Id.* In his affidavit,

Nadir Daya calls the March 2013 agreement an "Agreement in Principle."

---

[2]The Dayas argue in their response to HSBC's motion that Disdarevic's email was missing the key terms of (1) dismissing their claims and defenses with prejudice and (2) dismissing HSBC's claims without prejudice. (Docket #27 ¶7). The Dayas are mistaken, however, since Disdarevic's email undoubtedly includes those terms. Further, HSBC agrees with the Dayas that these dismissal terms were material to the settlement agreement. (Docket #29 ¶ 7.4).

Case 2:16-cv-00080-JPS   Filed 12/07/16   Page 5 of 34   Document 30

(Docket #25 ¶ 11). He avers that the Dayas never agreed to be bound by these discussions; instead, they reserved the right to review any proposed final written agreement with their attorney. *Id.* ¶ 12. He claims that

> [w]e had already run into problems with HSBC when we signed the reaffirmation agreement in our bankruptcy and HSBC failed and refused to live up to the terms of the agreement. We would be at a complete disadvantage in dealing with HSBC without a specific written agreement that both parties would sign off on and we would only do that with advice from counsel and only after being able to review all terms of the agreement.

*Id.* Hanson followed up on Disdarevic's response the same day, writing:

> I believe you have stated the basic terms of the settlement correctly, but for one thing. That is my clients are settling their claims for the payment of 10,000.00. In other cases with some similarities this is addressed in a written settlement signed by the parties. The case is then simply dismissed without prejudice and the Settlement Agreement prevents the defendants from raising the claims again. In other words, their claims are settled and therefore the terminology of dismissal with prejudice is not correct. So I would say a simple stipulation for dismissal of the foreclosure is what is called for – the Settlement Agreement can also be filed but usually is not. I do not have any objection to including language in the stipulation indicating the defendants have settled their claims with the plaintiff if you want to include something along those lines.

(Docket #21-4 at 9). After this exchange, on March 21, 2013, Disdarevic transmitted the following letter to the judge presiding over the foreclosure action:

> This letter is a follow up on the parties' conference call with your chambers earlier this week, in which the plaintiff's counsel and the defendants' counsel informed the Court that the parties have reached a settlement agreement that fully

resolves this case. As a result, plaintiff requests that the Court strike the hearing date on its Motion to Dismiss Defendants' Amended Counterclaims and Strike Amended Affirmative Defenses scheduled for March 25, 2013, at 10:00 a.m. Further, the parties request that the Court enter and continue this matter allowing them sufficient time to prepare and finalize the required settlement papers.

*Id.* at 13. Other attorneys, including Hanson, were copied on the letter. *Id.*

On April 2, 2013, Hanson sent Disdarevic a completed IRS Form W-9 for the issuance of the settlement check. (Docket #27 ¶ 10). On April 11, 2013, Hanson wrote to Disdarevic by email, stating that the "settlement check should be made out to Law [sic] Office of Rollie R. Hanson Trust Account." *Id.* ¶ 11. The Dayas claim, based on their counsel's prior emails, that the W-9 form and the payee instructions were sent in reliance on Disdarevic's representations that HSBC would produce a written settlement agreement no later than the end of April 2013. *See id.* ¶¶ 10–11; (Docket #25 ¶13). Nadir Daya further avers that he and his wife always expected that they would have to give final approval to a written agreement before the settlement would be consummated and that they never gave Hanson the authority to sign any such agreement on their behalf. (Docket #25 ¶¶ 14–15). HSBC, on the other hand, states that there are no communications in the record that would support reliance on a forthcoming written agreement as the Dayas contend. (Docket #29 ¶¶ 10.1 and 11.1).

The state court dismissed the foreclosure action with prejudice on May 29, 2013. (Docket #21-6). The order states that the reason for dismissal is that "[n]otice has been received that the case has settled, but *no* dismissal order has been submitted." *Id.* (emphasis in original).

On August 13, 2013, Disdarevic emailed Hanson the written settlement agreement and loan modification agreement for the Dayas' signatures. (Docket #21-4 at 20). The next day, Hanson wrote an email to Disdarevic that reads

> The Court entered the attached order dismissing the case with prejudice. It shows they sent you and the O'Dess office a copy. I assume Judge Davis got sick of waiting for some activity and threw the case out because you did not communicate with him. At this point it does not appear there is any reason for my clients to do anything. Let me know your thoughts.

*Id.* Disdarevic expressed surprise at Hanson's assertion, but it appears that the Dayas had decided not to sign the settlement agreement. *Id.* at 24; (Docket #25 ¶ 17) (Nadir Daya stating that after the dismissal, "we did not believe it was in our best interest" to sign the proposed agreement). Nadir Daya states that

> we did not see the written proposal until the latter half of August and it called for payment to start September 1, 2013. We objected to the short notice and we felt that once again HSBC was making unreasonable demands on us. Their actions reminded us of the way they treated us after we signed the reaffirmation agreement and they arbitrarily raised our mortgage payments.

(Docket #25 ¶ 18).

On August 20, 2013, as a result of Defendants' apparent unwillingness to go through with the Settlement Agreement, HSBC filed a motion asking the state court to vacate the Dismissal Order and reinstate the Foreclosure Case (the "Motion to Vacate"). (Docket #27 ¶16). Counsel exchanged some emails that day arguing as to whether the Dayas were justified in backing out of the settlement agreement. *See* (Docket #21-4 at 23).

On August 29, 2013, Hanson sent the following email to Disdarevic:

> I met with my clients last night and I believe we may be able to come to an agreement, provided we can make one change to the Loan Modification and Settlement Agreement. You sent me the documents approximately two weeks before the first payment due date of September 1, 2013. This was after we had no communication from you or your client for about 5 months. The Dayas are willing to sign an agreement that starts the payments October 1st, 2013 – they will do the deal and accept the terms we had talked about previously if we can agree to start the payments October 1st.
>
> Let me know if this will be acceptable to your client. Also, we will want to get the revised documents as soon as possible or perhaps an addendum to the agreement to change the due date to October 1st.

*Id.*

HSBC then revised the written settlement documents to reflect that Defendants' first modified payment would be due October 1, 2013. (Docket #27 ¶ 18). On September 4, 2013, Disdarevic sent Hanson the updated settlement documents with all other terms of the Settlement Agreement intact. (Docket #21-4 at 28–38). In his email, Disdarevic noted that he and Hanson had a telephone conversation the week prior "in which you confirmed that defendants will proceed with the settlement and loan modification as previously agreed." *Id.* at 28. He continued, "[a]s discussed, we have changed the date of the first payment to October 1st." *Id.* He further stated that the settlement and loan modification agreements "are subject to HSBC's review and approval, but in order to move things along, [HSBC] wanted to forward the drafts to you for your review." *Id.* Disdarevic concluded, "[p]lease let us know if you have any comments or suggestions, so that we can finalize and send it to the court." *Id.* In addition to the settlement agreement and loan modification agreement, Disdarevic also

attached a proposed stipulation and agreed order for submission to the state court, in which the parties agreed to vacate the May 29, 2013 dismissal and dismiss the Foreclosure Case without prejudice. *Id.* at 29.

> Hanson responded on September 5, 2013 as follows:
>
> To clarify, my clients are willing to go ahead with the agreement only if the payments will begin in October. If your client does not approve of that, we do not have an agreement. Also, I want to be clear on this, we never had an agreement as to when the payments would begin. Your client sending the agreement in the middle of August assuming my clients would agree to a September 1 payment date was never discussed. Have [sic] said this I trust that we will be able to go ahead with the agreement as you have now drafted it.

*Id.* at 40. Half an hour later, Hanson sent another email to Disdarevic, stating that "in reviewing the provisions of the Agreement in more detail I see some problems with it. We will need to revise some of the language. I will send you a letter shortly, I retract my previous email that the Dayas will sign as have [sic] drafted." *Id.* at 42.

Disdarevic responded that in HSBC's view, "the parties reached an agreement some time ago" and that, "because we're in agreement that payments will start on October 1st, we have an agreement even under your version of events." *Id.* He stated that he "look[ed] forward to your comments to the draft settlement documents" and requested that Hanson sign his proposed stipulation and order for submission to the court. *Id.* Hanson replied that the written settlement agreement was circulated "approximately 5 months after our initial agreement to settle this matter" and that the written agreement contained "provisions we never discussed or agreed to[.]" *Id.* at 49. Hanson contended that when the parties discussed their settlement agreement, he "always had in mind the agreement [he] outlined in [his] email

dated March 1, 2013." *Id.* He argued that several provisions in the written agreement did not comport with his understanding of the settlement terms discussed in March 2013. *See id.*

On September 9, 2013, Hanson sent a letter by email to Disdarevic to which he attached his comments on the draft settlement documents Disdarevic had sent on September 4. *Id.* at 46, 52–58. Hanson's edits included lining out a provision about the Dayas assuming the risk of loss from unknown or unanticipated results of the settlement. *Id.* at 55. He also crossed out the entire confidentiality provision of the agreement. *Id.* at 57; (Docket #25 ¶ 24) (Nadir Daya averring that the release and confidentiality provisions had not been discussed or agreed to). Disdarevic replied to Hanson's email that HSBC would "review your comments and circle back with you." (Docket #21-4 at 46). He also reiterated his request for Hanson's immediate signature on the proposed stipulation and order. *Id.*

Hanson responded later that day, stating, "[i]f we do not resolve the issues regarding the Settlement Agreement, it seems we do not have a deal." *Id.* He then wrote

> I [sic] may be better for me to respond to your motion and get a hearing date. If we do not have everything worked out it would them [sic] be possible for the court to enter an order to enforce the settlement as originally discussed and agreed upon by the parties. As I think about, it seems it would be best to simply stipulate to the case begin [sic] re-opened in anticipation of settlement, which we do not have nailed down at this point in time.

*Id.*

On the 10th of September, the Dayas filed a response to HSBC's Motion to Vacate. (Docket #21-7). In it, they represented that they were "not opposed to" vacating the Dismissal Order "to allow for reopening this case

and to allow the parties reasonable time to complete discussions to consummate a final written settlement agreement in principal [sic] and in accordance with certain provisions." *Id.* at 1. Further, the Dayas "acknowledge[d] discussions and an agreement to settle all claims in this action, but assert[ed] that HSBC failed to proceed with producing any written settlement agreement pursuant to discussions with and representations by counsel in a timely manner." *Id.* The Dayas characterized the March 2013 settlement discussions as "preliminary" and faulted HSBC for making no further efforts to finalize a written agreement until August 2013. *Id.* at 1–2. The Dayas asserted that if HSBC failed to follow through and finalize a written agreement a second time, they "reserve[d] the right to withdraw from said agreement or to seek judicial enforcement of the settlement agreement." *Id.* at 2. On some later date, the state court "dismissed" the Motion to Vacate. (Docket #27 ¶ 20). A copy of that order is not included in the parties' submissions.

On September 13, 2013, Disdarevic responded to Hanson's proposed changes to the settlement agreement from September 9. (Docket #21-4 at 60–61). He stated that he "need[ed] to discuss [the] proposed revisions with [his] client." *Id.* at 60. He also memorialized a conversation he had with Hanson earlier in the week during which they discussed his proposed changes. *Id.* The conversation resulted in some agreements on certain changes and an agreement to "circle back" on other proposed changes after the attorneys could discuss matters further with their respective clients. *Id.* at 61. The record does not reflect that Hanson replied to this email.

On October 1, 2013, Disdarevic sent Hanson "the finalized settlement agreement and loan modification agreement," along with a red-line version of the most recent drafts of those agreements. *Id.* at 60. The agreement

Disdarevic sent on October 1 included the changes agreed upon during the conversation he referenced in his September 13 email as well as Hanson's proposed changes to the confidentiality and release provisions, which HSBC had accepted. *Id.* The final version of the agreement also changed the date of the first payment thereunder to November 1, 2013. *Id.* Disdarevic requested that Hanson confirm that the final written agreements were acceptable and, if so, have the Dayas execute them. *Id.* Once that occurred, Disdarevic would send the copies to his client for execution and forward the settlement check for Hanson's attorney's fees. *Id.*

Disdarevic sent another email on October 7, 2013, reflecting that he and Hanson had discussed and agreed upon some "last, minor revisions to the settlement agreement[.]" *Id.* He attached the revised copy of the settlement agreement and loan modification agreement for the Dayas' execution and stated that he sent the agreements to HSBC for signature. *Id.* He again represented that he would send the settlement check as soon as he received the Dayas' signed copies of the agreements.

On October 18, 2013, Hanson sent Disdarevic a letter seeking an additional revision to the settlement documents. *Id.* at 78–79. The Dayas expressed concern about HSBC's cooperation in removing HSBC's trade line from their credit report pursuant to the Fair Credit Reporting Act. *Id.* Hanson proposed modifying two paragraphs of the agreement to make express HSBC's duty to comply with the Act in the event the credit reporting agencies failed to delete HSBC's trade line at the Dayas' request. *Id.* Hanson asked Disdarevic to confirm that this revision was acceptable to HSBC. *Id.*

Disdarevic sent an email to Hanson on October 29, 2013, attaching yet another "final" version of the settlement agreement which included Hanson's proposed modification from October 18. *Id.* at 81. The agreement also pushed

back the date of first payment from November 1 to December 1, 2013. *Id.* He asked Hanson to return executed copies of the documents as soon as possible. *Id.* Hanson responded on November 4, 2013, noting that he sent the documents to his clients and expected them to "complete their review shortly." *Id.* at 92. Hanson stated that he would forward any other questions from the Dayas to Disdarevic if they arose. *Id.*

Disdarevic sent Hanson an email on November 7, 2013 to memorialize a conversation between them from earlier that week. *Id.* He reported that "as we discussed, the settlement agreement and the loan modification agreement incorporate all of the principal terms upon which the parties have agreed, as well as the additional terms your clients recently requested." *Id.* Hanson and Disdarevic had discussed a request from the Dayas to move the first payment date back yet again, from December 1, 2013 to January 1, 2014, but Disdarevic wrote that "I believe that we're on the same page that given the length of time that has transpired, along with the settlement payment to be made upon the parties' execution of the agreement, the December 1st first payment date should stand." *Id.* He invited Hanson to correct any misrepresentations he may have may regarding the contents of the conversations, but it does not appear that Hanson did so. *Id.*

Instead, Hanson wrote on November 12, 2013 that he could not give "any conclusive feedback" until he met with his clients the following day. *Id.* at 104. Disdarevic next wrote on November 14, 2013 to inquire when HSBC could expect to receive the signed agreements from the Dayas. *Id.* Hanson replied that day that "I sent you a letter today via email. My clients are not going to sign the documents." *Id.* The letter stated that the Dayas "decided to decline the settlement offer" and included their counteroffer. *Id.* at 108–10. The counteroffer proposed new principal terms for the settlement agreement,

including a further reduction of the principal balance of the mortgage from $393,601.78 to $264,000 and forgiveness of a second HSBC mortgage with a value of $50,000—a mortgage which was never part of the foreclosure action at all. *See id.*; (Docket #27 ¶¶ 24–25). Disdarevic replied to Hanson on November 15, 2013 that

> the parties have already reached an agreement, which is embodied in the written settlement agreement and the loan modification agreement. We request that your clients reconsider their refusal to effectuate the agreement they have made and sign the settlement documents. Please let us know by Monday if they will do so.

*Id.* at 112. Hanson responded on November 18, 2013, writing that "I spoke with my clients and they are going to decline the settlement agreement" and that the Dayas "do not agree with your position that there is a binding agreement." *Id.* at 114. Instead, the Dayas "stand on their counter offer." *Id.*

HSBC then filed a second motion asking the circuit court to vacate the Dismissal Order and to reinstate the Foreclosure Case, which the court refused to hear, for reasons not explained by either party. (Docket #27 ¶ 28). This action came after.

## 4. ANALYSIS

The parties take divergent views as to whether and when they reached an agreement to settle the foreclosure case. Put simply, HSBC believes that the parties reached a binding settlement in March 2013 when they agreed to what were the material terms of the agreement. The lengthy period of communications that came after did not displace the agreement but merely worked out some additional details. Further, HSBC believes that the state court's dismissal of the foreclosure action did nothing to relieve the Dayas of

their obligation to finalize, in written form, the settlement agreement they had already reached in March 2013.

The Dayas take the position that the March 2013 agreement was preliminary and would not be binding until they committed their signatures to a written agreement. In short, they believe that it was an agreement to agree later on. The Dayas justify their choice to abandon the effort to create a written agreement by the fact that the state court dismissed the Foreclosure Action with prejudice, thereby depriving HSBC of its claims against them. Additionally, the Dayas complain that they thought the agreement had fallen apart because it took HSBC five months, from March to August 2013, to propose even the first draft of the written agreement.

A settlement agreement is a contract and therefore governed by the law applicable to contracts generally—that is, state law. *Laserage Technology Corp. v. Laserage Labs., Inc.*, 972 F.2d 799, 802 (7th Cir. 1992); *Am. Nat'l Prop. & Cas. Co. v. Nersesian*, 689 N.W.2d 922, 927 (Wis. Ct. App. 2004). Neither party disputes that Wisconsin law governs in this case.[3] An enforceable contract under Wisconsin law has three elements: offer, acceptance, and consideration. *Runzheimer Int'l, Ltd. v. Friedlen*, 862 N.W.2d 879, 885 (Wis. 2015). These three elements must result from a "meeting of the minds." *See Nersesian*, 689 N.W.2d at 927. Although "settlement agreements are favored

---

[3] The court sits in diversity, as HSBC is a Delaware corporation with a principal place of business in Illinois, while the Dayas are residents of Wisconsin. Additionally, the Dayas do not contest HSBC's allegation that the amount in controversy here exceeds $75,000, and the parties' submissions on summary judgment appear to substantiate that claim. 28 U.S.C. § 1332(a)(1); *Rexford Rand Corp. v. Ancel*, 58 F.3d 1215, 1218 (7th Cir. 1995) (the amount in controversy in cases seeking equitable relief is measured by "the value of the object of the litigation," and courts will accept a good-faith allegation of that amount unless it is a "legal certainty" that the true amount is less).

in the law, to create an enforceable settlement agreement" all the traditional elements must be met. *Id.*

Finding an enforceable contract relies on an assessment of the parties' intent to be bound. This is a question of fact. It is not, however, always a question for the jury. Wisconsin courts view the intent inquiry through an objective lens by looking at the parties' words, both written and oral, and their actions. *Nersesian*, 689 N.W.2d at 928. "An intent to be bound by contract does not invite a tour through [the party's] cranium. . . . The status of a document as a contract depends on what the parties express to each other and to the world, not on what they keep to themselves." *Skycom Corp. v. Telstar Corp.*, 813 F.2d 810, 814 (7th Cir. 1987). When the parties' public or shared conduct is undisputed, summary judgment is appropriate. *C.G. Schmidt, Inc. v. Permasteelisa N.A.*, 825 F.3d 801, 806 (7th Cir. 2016); *Ziolkowski v. Caterpillar Inc.*, 996 F.2d 1220, 1993 WL 230140, at *2 (7th Cir. 1993).

An "agreement to agree" is not enforceable as a contract in Wisconsin. *Witt v. Realist, Inc.*, 118 N.W.2d 85, 93–94 (Wis. 1962). Moreover, "[i]t is well settled that no contract is formed where two parties consider the details of a proposed agreement. . .[with] the understanding during this process that the agreement is to be embodied in a formal written document and that neither party is to be bound until he executes the document." *Gruen Indus., Inc. v. Biller*, 608 F.2d 274, 277 (7th Cir. 1979) (internal citations omitted). In essence, "where, during preliminary negotiations, it is understood that one party is to prepare and present for signature to the other a formal written agreement to evidence the contemplated contract, no contract is entered into unless the written agreement is actually prepared, presented, and signed." *Milwaukee Med. Coll. v. Marquette Univ.*, 242 N.W. 494, 496 (Wis. 1932).

Also relevant to this case is Wis. Stat. § 807.05, which provides that "[n]o agreement, stipulation, or consent between the parties or their attorneys, in respect to the proceedings in an action or special proceeding shall be binding unless. . .made in writing and subscribed by the party to be bound thereby or the party's attorney." The purpose of the statute, which creates an exception to the general rule that oral contracts are enforceable, is to "prevent disputes and uncertainties as to what was agreed upon" in the context of setting court cases. *Adelmeyer v. WEPCO*, 400 N.W.2d 473, 475 (Wis. Ct. App. 1986). Under this statute, a party may be bound by a settlement by either his subscription or that of his attorney. *Mitchell v. Am. Family Mut. Ins. Co.*, 371 Wis.2d 759, 2016 WL 4519356, at *2 (Wis. Ct. App. Aug. 30, 2016). The requirement that a name be "subscribed" does not mean that there must be "a personal handwritten 'signature.'" *Laska v. Laska*, 646 N.W.2d 393, 396 (Wis. Ct. App. 2002). Instead, a typed or rubber-stamped signature by the party or his attorney will suffice. *Id.*; *In re Estate of Johnson*, 709 N.W.2d 88, 92–93 (Wis. Ct. App. 2005).

### 4.1    The Agreement

In this case, the parties' exchange of emails in March 2013 demonstrate that they reached a binding, enforceable settlement agreement. Hanson initiated the exchange on March 1, 2013, when he sent an email, bearing his typed signature, stating that the Dayas "are agreeable to settling this case as outline below per your latest counter offer." (Docket #21-4 at 5–6). Hanson listed the material terms of the settlement agreement. *Id.* Hanson also requested "clarification" as to the nature of the dismissal of the Foreclosure Case. *Id.* He concluded his email with the request that Disdarevic "confirm. . .that we have an agreement and confirm the dismissal of the foreclosure." *Id.* This was an offer. *See Alliance Laundry Sys. LLC v. Stroh Die Casting Co.*,

Case 2:16-cv-00080-JPS   Filed 12/07/16   Page 18 of 34   Document 30

763 N.W.2d 167, 175 (Wis. Ct. App. 2008) (an offer is "the manifestation of a willingness to enter into a bargain, made to justify another person's understanding that assent to that bargain is invited and will create a contract").[4]

HSBC's response, on March 6, 2013, was an acceptance of this offer. Disdarevic listed all but one of the terms Hanson proposed in his March 1 email in order to "confirm the parties' agreement in principle to settle" the foreclosure case. *Id.* at 5. The one term Disdarevic forgot was that there would be an "approximate new P&I payment [of] $1,712.98." *Id.* at 5–6. However, the omission of this term from Disdarevic's acceptance does not mean that the acceptance failed. First, the calculation of mortgage payments appears to be a purely mathematical function derived from the principal amount of the mortgage, the interest rate, and the length of the loan. Neither party suggests otherwise. Second, and more importantly, the Dayas do not raise in their opposition that this term was material. Indeed, they do not even appear to have noticed that it was omitted from Disdarevic's March 6 email. As a result, the omission of this one line from HSBC's acceptance does not undercut its power as an acceptance of the Dayas' March 1, 2013 offer.

The same is true for the statements in the balance of Disdarevic's March 6 email. Disdarevic noted that the settlement was "subject to the execution of releases" by the Dayas and HSBC and that he would confer with HSBC about how it "intends to memorialize the new terms of the mortgage

---

[4]Hanson stated in his email that the Dayas expressed their agreement to settle the foreclosure case according to the terms of HSBC's latest counteroffer. From that perspective, Hanson's March 1 email could be seen not as the Dayas' offer of settlement, but as an acceptance of HSBC's offer of settlement. The Court need not pursue this line of inquiry, however, since the rest of the record makes clear that HSBC accepted the terms Hanson set forth in his March 1 email.

loan." *Id.* Disdarevic stated that after that conversation with HSBC he would send Hanson a draft written settlement agreement. *Id.* Most settlement agreements end with the signing of a release of claims and the dismissal of the pending litigation. If execution of the releases was an indispensable precursor to achieving a binding settlement agreement, then parties could back out of hard-fought negotiations up until the moment of execution. Contract law exists to prevent such gamesmanship, and even the strictures of Wis. Stat. § 807.05 do not countenance this approach to settling lawsuits. Thus, the parties exchanged an offer, an acceptance, and consideration (in the form of mutual promises to fulfill their obligations under the agreement) as of March 6, 2013.

The same result was reached in *Centrifugal Acquisition Corp., Inc. v. Moon*, No. 09–C–327, 2013 WL 352595 (E.D. Wis. Jan. 29, 2013), a case which, like this one, involves a party seeking to escape from a settlement agreement. The Court found the agreement was enforceable based on an exchange of emails between counsel. *Id.* at *1. Defense counsel sent an email to confirm the parties' oral agreement to settle the case. *Id.* His email included a listing of the material terms and noted that "some details remain to be worked out between the lawyers in a formal written settlement agreement." *Id.* The plaintiff's counsel responded shortly thereafter, confirming that the parties had indeed "reached an agreement in principal on the general terms of a settlement. . .with additional details to be worked out as noted." *Id.* The Court found that these two emails "prove[d] the existence of a settlement agreement, even though there were some 'details' to be worked out." *Id.* Further, the agreement, though subscribed to by the attorneys and not the parties directly, satisfied the requirements of Wis. Stat. § 807.05. *Id.*

As in *Moon*, here the parties' counsel exchanged emails regarding settlement. Hanson's March 1, 2013 email contained the material terms of the settlement offer, including terms related to dismissing the Foreclosure Case, changing the terms of the Dayas' mortgage loan, and paying the Dayas' attorney's fees. Disdarevic accepted those terms on HSBC's behalf in his March 6, 2013 email. Like *Moon*, the fact that a written agreement would come later did not prevent the creation of an enforceable agreement at the moment of Disdarevic's acceptance. Also similar to *Moon*, the subscription of HSBC's and the Dayas' counsel to the settlement emails sufficed to make the contract enforceable under Wis. Stat. § 807.05. Thus, the parties had created an enforceable contract as of March 6, 2013.

### 4.2    The Aftermath

What came after did not unravel the deal struck that day. The Dayas raise a litany of supposed defects in the settlement, but none of their arguments has any merit.

#### 4.2.1    Agreement Versus Memorialization

First, the Dayas assert that they always expected that they would have the right to accept or reject a settlement agreement in its final written form. (Docket #25 ¶ 14). "Some litigants in pursuing settlement of their claims hold the belief that they can change their mind at any time before they actually sign the agreement. . . . [T]hat perception is often unfounded in the law." *Pohl v. United Airlines, Inc.*, 213 F.3d 336, 337 (7th Cir.2000). Here, the parties' communications and conduct, viewed objectively, belie the Dayas' claim that they did not manifest their intent to contract in the March 2013 emails. *Mgmt. Comp. Servs., Inc. v. Hawkins, Ash, Baptie, & Co.*, 557 N.W.2d 67, 75 (Wis. 1996) (mutual asset "does not mean that parties must subjectively agree to the same interpretation at the time of contracting. Instead, mutual assent is

judged by an objective standard, looking to the express words the parties used in the contract.").

After entering on behalf of the Dayas in the Foreclosure Case, Hanson engaged in settlement negotiations with HSBC. Hanson stated on March 1, 2013 that the Dayas were agreeable to settling the case on the terms proposed, which HSBC accepted on March 6. Hanson never apprised Disdarevic, at any time prior to reaching the settlement agreement, that his clients had to signed the dotted line before any settlement would be effective.[5]

Similarly, Hanson's March 6, 2013 reply to Disdarevic's email of that same day requested a clarification that both parties' claims would be dismissed without prejudice, rather than only HSBC's. (Docket #21-4 at 9). Nowhere in the email does Hanson repudiate the agreement; he simply proposes a stipulation of dismissal signed by both parties, a procedure common in litigation settlements. He then sent a completed Form W-9 to Disdarevic on April 2, 2013 to facilitate payment of attorney's fees as contemplated by the March 2013 agreement. This conduct echoes the parties' previously expressed intent to be bound to the March 2013 settlement agreement.

Likewise, the March 21, 2013 letter from Disdarevic to the state court, which he copied to Hanson, reports that the parties had a conference call

---

[5]The Court does not credit the Dayas' specious argument that March 2013 negotiations were incomplete because there were to be two different written agreements—a settlement agreement and a loan modification agreement. (Docket #26 at 15). Parties are masters of their affairs, *Skycom*, 813 F.2d at 814, and may embody their agreements in as many separate documents as they wish. The terms reflected in the March 2013 emails would serve to flesh out both a settlement agreement and a loan modification agreement, and the Dayas do not contend that any material terms of either agreement were left out.

Case 2:16-cv-00080-JPS   Filed 12/07/16   Page 22 of 34   Document 30

with the judge that week and reported that they had reached a settlement that fully resolved the Foreclosure Case. Hanson never voiced an objection to Disdarevic's letter or the fact that the parties had reached a settlement. In short, if the Dayas harbored some belief that the settlement would be ineffective without an executed written agreement, they kept this to themselves. *See C.G. Schmidt*, 825 F.3d at 806 (finding that no contract existed where one party "made clear that it intended to be bound only after reviewing" the final written agreement and that the other party "never corrected this understanding nor expressed a contrary belief").

The Dayas' argument that there was only an agreement to agree is a *post hoc* rationalization for their decision to back out of the agreement. The Dayas rely heavily on this statement from the Seventh Circuit: "Even if parties agree, point by point, on all the terms of a contract, if they understand that the execution of a formal document shall be a prerequisite to their being bound there is no contract until the document is executed." *Lambert Corp. v. Evans*, 575 F.2d 132, 135 (7th Cir. 1978). However, if this was the state of affairs between the parties—if the Dayas always expected that they could back out of the March 2013 agreement before signing—then they failed to make that known to anyone at the time. Rather, their situation is best described by the next sentence in the *Lambert* opinion, which reads, "[o]n the other hand, if it is agreed that a formal document will be prepared to memorialize a bargain the parties have already made, the bargain is enforceable even though the document has not been executed." *Id.*

As in *Lambert*, the Dayas' argument is "not wrong on the law" but is "wrong on the facts." *Id.* In *Lambert*, the Court of Appeals found enforceable an oral agreement for the sale of equipment. *Id.* The plaintiff believed that the oral agreement was binding while the defendant thought a written

agreement was required. *See id.* at 136. The district court found at a bench trial that the plaintiff was more credible, and the Seventh Circuit upheld that finding. *Id.* Of course, this Court is deciding summary judgment and cannot make credibility determinations. Yet the Seventh Circuit made several observations which are helpful here. The circuit court first noted that the defendant did not make clear at the time the contract was consummated that a written agreement was needed to make the agreement enforceable. *See id.* Neither did the defendant express its belief that no agreement had been formed until months afterward, despite numerous intervening calls and letters between the parties. *Id.*

In this case, the Dayas similarly failed to raise any claim that a written agreement would be required before the settlement was enforceable prior to the Dismissal Order in May 2013. Hanson's August 14 email regarding the Dismissal Order and his clients' decision to renege on the March 2013 agreement was the first public indication that the Dayas did not agree to the terms as discussed in March 2013. This change in position appears to be predicated on what the Dayas viewed as the "fortuitous windfall" of the state court's dismissal order. (Docket #20 at 14). The Court need not explore the Dayas' motivations for their decision to renege on the agreement, however, since at the time of contracting—and for two months thereafter—they made no indication that the settlement agreement was not binding. Thus, *Lambert* offers the Dayas no shelter.

The Seventh Circuit's opinion in *Skycom* also provides a useful contrast to this case. There, the Court of Appeals found that the parties' "agreement in principle" was unenforceable. *Skycom*, 813 F.3d at 816. The Court reasoned that there were several indicia in the parties' communications and course of dealing showing that the "agreement" they reached was never

intended to be binding. *Id.* First, an expression that there is an agreement "in principle" normally indicates an intent not to be bound. *Id.* at 814. Second, the "agreement" was memorialized only in a letter of intent which itself expressly referred to a forthcoming "formal agreement." *Id.* Third, the purported agreement contained several important contingencies. *Id.* at 816. Those contingent conditions "call[ed] for further inquiry, further performance, further rights of approval. These envision[ed] renegotiation or cancellation" in the event the conditions went unfulfilled. *Id.* As such, the letter allegedly reflecting the parties' agreement was "not complete" and, because the contingencies did not materialize, "it never became so." *Id.*

The situation in this case is very different from *Skycom*. Although in his March 6, 2013 email Disdarevic used the words "agreement in principle" and made reference to a forthcoming final written agreement, nothing else about the parties' communications intimates that the deal they reached was preliminary and non-binding. The agreement contained all the material terms of the settlement, as both parties acknowledge. More importantly, the agreement contained no contingencies or preconditions, as did the letter of intent in *Skycom*. Unlike the case before the Seventh Circuit, here there was no condition precedent that needed to occur before a full agreement was reached. The only thing standing in the way of the parties' signatures on the final written agreement was the drafting process. Thus, *Skycom* underscores why the settlement agreement in this case was, to any objective observer, intended to be binding and enforceable.

The Dayas believe that if they are held to the agreement they reached in March 2013, they would have had to "blindly sign off" on whatever written version of the agreement HSBC later proposed. (Docket #26 at 13). This is a misunderstanding of basic contract law. They parties could—and

Case 2:16-cv-00080-JPS   Filed 12/07/16   Page 25 of 34   Document 30

did—continue to negotiate terms outside the core, material terms of the settlement. If HSBC had altered those material terms in its written proposals, the Dayas could have sought to enforce the contract in the form it was agreed upon in March 2013. *See Wiederholt Excavating & Trench v. Probst*, 587 N.W.2d 458, at *1 (Wis. Ct. App. 1998). Indeed, that is precisely what the Dayas threatened to do in their response to HSBC's first motion to vacate the dismissal order. The Dayas' representations in that brief confirm that they believed that a settlement agreement existed. There is no way to square their threat of seeking to enforce the March 2013 settlement agreement with the idea that no settlement agreement yet existed.

### 4.2.2    Counsel's Settlement Authority

Second, the Dayas assert that they never gave Hanson the authority to enter into a settlement agreement on their behalf. (Docket #25 ¶ 15). But this contention is inconsistent with nearly all their public conduct during the relevant period as explained above. Moreover, the Dayas may not avoid summary judgment on the bare assertion that their lawyer never had authority to settle. Under Wisconsin law, while an attorney is the client's agent and only exercises the authority granted to him, it is the client's burden to prove that the attorney lacked authority to settle. *D&D Carpentry, Inc. v. U.S. Bancorp*, 792 N.W.2d 193, 197 (Wis. Ct. App. 2010). To do so, the Dayas had to assert that Hanson lacked authority "upon learning of [his] unauthorized act." *Id.*; *Fosha v. O'Donnell*, 97 N.W. 924, 927 (1904) (client demonstrated lack of authority when she "promptly and actively declared her nonassent and condemnation of the unauthorized acts of her attorney"). Thus, the Wisconsin Court of Appeals found a factual dispute about settlement authority where the client, "after learning that the court ordered binding arbitration upon her attorney's consent, hired new counsel and filed

a motion to reconsider based on her original counsel's lack of authority."
*D&D Carpentry*, 792 N.W.2d at 198. Likewise, the Wisconsin Supreme Court held that the client sufficiently raised an objection to her attorney's authority when, after learning for the first time that her case was settled when she received the settlement payment, she filed a new lawsuit challenging the validity of the settlement. *Fosha*, 97 N.W. at 927. By contrast, the same court held that a client was bound to a settlement when he learned that his lawyer had settled the case without his authorization and yet made no effort to apprise anyone of the lack of authority. *Balzer v. Weisensel*, 46 N.W.2d 763, 765 (Wis. 1951).

The Dayas did not raise this purported lack of authority at any time during the period from March to November 2013 despite numerous conversations with Hanson about the terms of the settlement and ongoing discussions to hammer out the particulars of the written agreement. All their representations during the relevant period point to the opposite conclusion: that Hanson did have and exercised his authority to settle the foreclosure case on terms to which the Dayas agreed. In fact, a review of the docket in the instant case reveals that the Dayas did not even raise the lack of authority in their answer to HSBC's complaint. *See* (Docket #11). The first time anyone heard that Hanson lacked authority to settle the foreclosure case, it seems, was on November 7, 2016, when the Dayas responded to HSBC's summary judgment motion. This eleventh-hour attempt to raise a factual dispute fails.

### 4.2.3   Delay in Providing a Written Agreement

Third, the delay in HSBC's provision of a first draft of the written settlement agreement did not undo the settlement itself. The Dayas cite no authority at all for the proposition that a delay of a few months between the

consummation of an agreement and its memorialization unwinds the agreement itself, and the Court located no such authority.

An analogous situation arises in claims of delayed performance under a contract. In those cases, any problems occasioned by the delay fall on the shoulders of the delaying party. *See Ash Park, LLC v. Alexander & Bishop, Ltd.*, 767 N.W.2d 614, 623 (Wis. Ct. App. 2009). But even there, the party seeking relief must show that the delay harmed him in some way. *See id.* (noting that damages for delay in performance are used to make the injured party whole where specific performance would be inadequate). The Dayas have not marshaled any evidence to show that they suffered prejudice or damages as a result of the delay. Their complaint, at best, is that the drafting simply took too long for their liking. In fact, the whole line of reasoning on this point is suspect, since delay worked to the benefit of the Dayas, not HSBC. A longer delay in finalizing the written agreement meant a longer delay in making the first mortgage payment under the revised mortgage loan agreement.

And it is not at all clear that rescission, rather than damages, would be available to the Dayas as a remedy for delayed performance. There is no indication in the parties' conduct, communications, or otherwise that time was of the essence in drafting the final written agreement. *See DeSombre v. Bickel*, 118 N.W.2d 868, 871 (Wis. 1963) (where time is of the essence, as shown by the terms of the contract or the parties' conduct, late performance permits the innocent party to rescind the contract). The record contains no communications from the Dayas, prior to August 2013, expressing concern at the length of time that had elapsed between their March 2013 agreement at HSBC providing an initial draft of the written agreement. Nor was there any warning from their quarter that they intended to rescind the agreement based on that delay. The delay was, at best, a minor breach would entitle the

Dayas to damages (assuming they incurred any) but would not excuse their duties under the agreement. *DeSombre*, 118 N.W.2d at 871; *Mgmt. Comp. Servs.*, 557 N.W.2d at 77–78. This argument fares no better than the others.

### 4.2.4   Additional Terms

Finally, the additional terms discussed throughout August, September, October, and November 2013 were not material and, as a result, the ultimate failure to agree upon them does not undo the previously reached settlement. For three reasons, those terms are not a part of the settlement agreement reached by the parties in this case.

First and foremost, it does not appear that HSBC wishes any of those terms to become a part of the contract. In its reply, HSBC notes that the terms of the agreement for which they seek a declaratory judgment are embodied in the March 2013 emails. *See* (Docket #29 at 1 n.1). Any terms negotiated later are therefore immaterial to the present decision.

Second, those later-negotiated terms were not material to the settlement agreement reached in March 2013. Both parties have admitted as much. Indeed, each party called for the other to live by those terms at various points in the negotiations. The terms discussed later were therefore merely ancillary details to be worked out in the final memorialization of the agreement. Failure to agree on those terms does not mean the contract does not exist, only that it exists without those terms. As the Seventh Circuit noted in *Lambert*, "there is nothing in the law of contracts that requires parties' minds to meet on all conceivably related questions." *Lambert*, 575 F.2d at 135.

Third, "a party to a contract cannot unilaterally modify its terms without the other party's assent." *Schaefer v. Dudarenke*, 278 N.W.2d 844, 848 (Wis. 1979). Moreover, as noted above, the terms of a settlement agreement must be subscribed to in accordance with Wis. Stat. § 807.05 to "prevent

disputes and uncertainties as to what was agreed upon" in the context of setting court cases. *Adelmeyer*, 400 N.W.2d at 475. While the Court can discern from the record both parties' unmistakable assent to the terms discussed in March 2013, it cannot locate equally clear indications with respect to any terms negotiated afterwards. At best, based on the record before the Court, the last subscription Hanson gave on the Dayas' behalf was in an email dated September 5, 2013. In the email, Hanson approved HSBC's proposed settlement agreement and a date of first payment of October 1, 2013. Even here, however, Hanson immediately backtracked, noting in a follow-up email that there were terms in HSBC's proposed written agreement that would require further review. Disagreements and vacillations pervaded the remainder of the settlement negotiations until they failed entirely some months later. As a result, the Court, viewing the parties' conduct objectively and observing the heightened requirements for settlement agreements under Wis. Stat. § 807.05, cannot find that terms negotiated after March 2013 became a part of the settlement agreement.

Accordingly, the additional terms discussed in late 2013 do not undo the binding quality of the agreement reached in March of that year, nor did they become a part of that agreement.

### 4.3    Relief

Now that the Court has discerned the contours of the contract at issue here, it must decide what relief is appropriate. The Court begins with HSBC's Amended Complaint, which prays for an order

a. Declaring the Settlement Agreement valid and enforceable;

b. Declaring that the Note, as modified by the Settlement Agreement, remains in full force and effect;

c. Declaring that the Mortgage, as modified by the Settlement Agreement, remains in full force and effect as the first lien on the Property;

d. Awarding HSBC all of its costs and attorneys' fees incurred in prosecution of this case.

(Docket #4 at 8). The Court's power to grant a declaratory judgment is found in the Declaratory Judgment Act, 28 U.S.C. § 2201(a), which provides that a court "may" declare the rights and legal relations of parties in cases under its jurisdiction. The word "may" is important, for the Supreme Court has held that "since its inception, the Declaratory Judgment Act has been understood to confer on federal courts unique and substantial discretion in deciding whether to declare the rights of litigants." *Wilton v. Seven Falls Co.*, 515 U.S. 277, 286 (1995); *Brillhart v. Excess Ins. Co. of America*, 316 U.S. 491, 495 (1942).

The Dayas do not ask the Court to decline jurisdiction in this case. Indeed, neither party addresses the statute at all. Nevertheless, the Court is permitted in such cases to consider the issue on its own. In most cases the federal courts have a "virtually unflagging obligation" to exercise the jurisdiction conferred on them by Congress. *Colo. River Water Conservation Dist. v. United States*, 424 U.S. 800, 817 (1976). But in the declaratory judgment context, "the normal principle that federal courts should adjudicate claims within their jurisdiction yields to considerations of practicality and wise judicial administration." *Wilton*, 515 U.S. at 288.

The reasons for choosing abstention in declaratory judgment cases usually revolve around concurrent state court litigation. If a case similar to the federal action is pending in state court, the district court should inquire "whether the parties in the two actions are identical, whether the declaratory judgment action will serve a useful purpose or merely amount to duplicative

or piecemeal litigation, and whether the plaintiff seeking declaratory relief may obtain comparable relief in the state proceeding." *Nationwide Ins. v. Zavalis*, 52 F.3d 689, 692 (7th Cir. 1995). The federal court should not, by exercising jurisdiction, be part of an effort by one party to race to judgment ahead of the state court. *See NUCOR Corp. v. Aceros Y Maquilas de Occidente, S.A. de C. V.*, 28 F.3d 572, 579 (7th Cir. 1994). The district court can also consider whether the state law at issue is unsettled or the case is a close one and therefore would be better left for the state court to address in the first instance.  *Sta–Rite Indus., Inc. v. Allstate Ins. Co.*, 96 F.3d 281, 287 (7th Cir. 1996).

In this case, none of these concerns are present. There is no pending state court action over these same issues. The law in Wisconsin on the issues presented is not unsettled, and HSBC's victory here was not a close one. At most, there may be an argument that HSBC should have pursued this declaratory judgment action in state court, since that is where the original litigation, out of which came the March 2013 contract, occurred. But this is not in itself a reason to decline to hear the case. District courts should "be careful not to lightly decline to exercise jurisdiction," *St. Paul Fire & Marine Ins. Co. v. Land Title Servs., Inc.*, 483 F. Supp. 2d 745, 748 (E.D. Wis. 2007), and although it may have been preferable to leave this contract claim to a Wisconsin court, there is no question that this Court also has jurisdiction here. *See Kokkonen v. Guardian Life Ins. Co. of America*, 511 U.S. 375, 382 (1994) (holding that "enforcement of the settlement agreement is for state courts, unless there is some independent basis for federal jurisdiction"). Thus, the Court does not find it appropriate to abstain from granting HSBC a declaratory judgment that a valid and enforceable settlement agreement exists between the parties.

However, the Court will not grant the second and third items HSBC prayed for, namely (1) declaring that the Note, as modified by the settlement agreement, remains in full force and effect, and (2) declaring that the Mortgage, as modified by the settlement agreement, remains in full force and effect as the first lien on the Property. HSBC's complaint and its motion for summary judgment seek declaratory relief. These two additional items represent not a declaration that an agreement exists but an attempt to enforce it against the Dayas. HSBC has not prayed for or presented argument directed at enforcement of the agreement or the appropriate remedy for an alleged breach. If the Dayas refuse to abide by the agreement recognized in this order, and judicial enforcement is required, it will be for another day and another action—preferably committed to the state court where this matter originated. *See Skelly Oil Co. v. Phillips Petroleum Co.*, 339 U.S. 667, 671–72 (1950) (observing that "[t]he Declaratory Judgment Act allowed relief to be given by way of recognizing the plaintiff's right even though no immediate enforcement of it was asked").

Additionally, the Court will not award HSBC its costs and attorney's fees incurred in this action. HSBC repeats this request in its briefing, arguing that its attorney's fees should be paid pursuant to the settlement agreement. (Docket #20 at 18). But the settlement agreement at issue here was reached in March 2013, and it says nothing about fees incurred as a result of litigation over the agreement. Even in the disputed written memorializations of the agreement, negotiated in late 2013, the settlement agreement places the responsibility for paying attorney's fees on each party. (Docket #21-4 at 97). Because of this, and because HSBC has failed to elaborate on the basis for its request for fees, the Court sees no reason to depart from the settled rule that each party pays it own way in federal court absent some express indication

Case 2:16-cv-00080-JPS   Filed 12/07/16   Page 33 of 34   Document 30

otherwise by statute or contract. *See Alyeska Pipeline Service Co. v. Wilderness Society*, 421 U.S. 240, 258–259 (1975).

**5.     CONCLUSION**

The parties here reached a binding, enforceable settlement agreement as to their claims and defenses in the Foreclosure Case. Because the Court finds that such an agreement exists, it need not address HSBC's alternative claims of equitable and judicial estoppel.

Accordingly,

**IT IS ORDERED** that Plaintiff HSBC Mortgage Services Inc.'s motion for summary judgment (Docket #19) be and the same is hereby **GRANTED in part** and **DENIED in part**.

**IT IS FURTHER ORDERED** that this action be and the same is hereby **DISMISSED with prejudice**.

The Clerk of the Court is directed to enter judgment accordingly.

Dated at Milwaukee, Wisconsin, this 7th day of December, 2016.

BY THE COURT:

J.P. Stadtmueller
U.S. District Judge